Larry Jens **CHRISTENSEN**, Appellant,

v.

**MINNEAPOLIS MUNICIPAL EMPLOYEES RETIREMENT BOARD, et al., defendants and third-party plaintiffs, Respondents,**

v.

**STATE of Minnesota, third-party defendant, Respondent.**

No. C7–82–601.

Supreme Court of Minnesota.

March 18, 1983.

---

Popham, Haik, Schnobrich, Kaufman & Doty and Bruce D. Willis, Minneapolis, for appellant.

Fredrikson, Byron, Colborn, Bisbee & Hansen and Frederick E. Finch, Minneapolis, for Minneapolis Mun. Employees Retirement Bd., et al.

Hubert H. Humphrey, III, Atty. Gen., and Douglas C. Blomgren, Sp. Asst. Atty. Gen., St. Paul, for State of Minn.

Peterson, Engberg & Peterson, Jay Y. Benanav and Roger A. Peterson, Minneapolis, for Minneapolis Police Relief Assn., et al.

Sigal & Miller and Samuel I. Sigal, Minneapolis, for Central Labor Union Council of Minneapolis and Hennepin County.

SIMONETT, Justice.

This appeal raises the question of whether a retired public employee's pension may be discontinued by an act of the legislature changing the eligibility requirements. The trial court, believing itself bound by earlier decisions of this court characterizing a government pension as a gratuity, held that the legislature was not prohibited by the constitution from imposing, as to employees already retired, an age requirement of 60 years before benefits could be paid where previously there had been no age requirement. We conclude that the gratuity approach no longer accurately portrays the public employees' retirement system and that the amendment of the retirement age as to employees already retired is an unconstitutional impairment of contract; and we reverse.

On January 2, 1974, at the age of 38, plaintiff-appellant Larry Jens Christensen resigned from city service, service which began in 1951. From 1951 through 1964 he worked part time for the city as an election helper. He was then elected to the Minneapolis City Council for a term commencing July 1, 1965, and served in that capacity until January 2, 1974. In 1966, on his own application, he became a contributing member of the Minneapolis Municipal Employees Retirement Fund (MMERF), and, upon leaving public service on January 2, 1974, he became entitled to pension benefits, having served the requisite 10 years. 1969 Minn. Laws, ch. 914, § 3.

Effective January 2, 1974, Christensen began receiving his monthly pension of $355.19 a month, which was later raised in January 1978 to $369.40 a month. When he left city service in 1974 Christensen elected to receive a lower than possible monthly payment to himself so that a monthly payment could later be made to a surviving spouse. In April 1980, the retirement board suspended further monthly pension benefits to Christensen until he attained the age of 60 because of the enactment of 1980 Minn. Laws, ch. 342, § 22, codified at Minn.Stat. § 422A.156 (1982), which imposed the new minimum age requirement for entitlement

to benefits. Christensen is now 48 years old and must, therefore, wait 12 years or so before again becoming eligible to receive pension benefits. At that time his benefits will be $622.69 a month.

The trial court found that Christensen knew, while in public service, that he would be entitled under the law to pension benefits after he had worked for the city for 10 years without regard to his age, and that Christensen had considered this fact in making his decision to run for election and reelection to city office. At the time of trial, Christensen was working as a part-time janitor and groundskeeper.

The trial court found that there are eight other formerly elected, now retired Minneapolis city officials besides Christensen who had chosen to become contributing members of the pension plan and whose retirement benefits were discontinued upon the enactment of section 422A.156. These former officials ranged in age from 32 to 52 years when they began receiving monthly retirement payments and had served as elective city officials from 2 to 14 years.

Christensen commenced this action for declaratory and injunctive relief against the defendant-respondents, Minneapolis Municipal Employees Retirement Board and John C. Chenoweth, its executive secretary. These defendants, in turn, brought in the State of Minnesota as a third-party defendant.[1] Plaintiff Christensen contended that the new statute, section 422A.156, was unconstitutional, at least as to him, in that it deprived him of property (his pension benefits) without due process of law, or, alternatively, it impaired his contract of employment with the City of Minneapolis, the performance of which he had completed, in violation of the state and federal constitutions. The case was bifurcated for trial, proceeding to trial first on stipulated facts as to the constitutional issues. The trial court found that plaintiff Christensen's rights in the retirement fund were not vest-ed except as to pension payments already received and that plaintiff's constitutional rights were not violated by application of section 422A.156. The trial court dismissed plaintiff's action and this appeal follows.

We have three issues before us: (1) Did the 1978 and 1980 amendments to chapter 422A setting age 60 as the age for receipt of pension benefits for retired elective officials change the pension eligibility requirements? (2) If so, does the retired elective official have a right to future retirement benefits which is unaffected by the change in the eligibility requirements? and (3) If such a right exists, is it entitled to constitutional protection?

I.

The preliminary issue is whether the 1978 and 1980 amendments of section 422A.156 changed the requirements for pension eligibility from what they had been before. If, as the state contends, the city's pension plan, even before 1978, required elected city officials to attain age 60 before receiving their monthly benefits, then the amendments in 1978 and 1980 did not change the law but merely stated what the law had always been. If this is true, then the amendments have no retroactive effect and we do not reach the constitutional issues. The trial court rejected the state's argument, as do we.

At this point we should describe the pertinent pension eligibility requirements and their legislative history. Chapter 422A describes the retirement program for employees of the City of Minneapolis. Under section 422A.09, city employees are divided into two classes, the contributing class and the exempt class. Among those in the exempt class are persons holding elective office. Elected officials, however, since 1937, can choose to become members of the contributing class and be covered under the pension plan. From 1937 until 1978, elected officials apparently were considered eligible

---

1. In its third party complaint, the Minneapolis Municipal Retirement Board alleges that if Minn.Stat. § 422A.156 (1982) were declared unconstitutional the pension fund would incur an unfunded liability or actuarial loss which the State of Minnesota would be required to fund pursuant to Minn.Stat. § 422A.101, subd. 3 (1982).

for a retirement allowance if they applied to the retirement board for pension benefits based on the number of years in service without regard to age upon retirement. This practice differed from nonelected city employees who, under the law, could not receive retirement benefits until they reached age 60.

In 1978 the legislature amended Minn. Stat. § 422A.09, subd. 3(2), to make elected city officials subject to the same minimum age requirement for eligibility as had always been the case for nonelected employees. *See* 1978 Minn.Laws, ch. 562, § 11. This 1978 change imposing an age requirement of 60 years for elected city officers was expressly given only prospective application; *i.e.,* only elected officials first holding office *after* the effective date of the act were subject to the minimum age requirement. *Id.,* § 35.

However, in 1980 the legislature enacted 1980 Minn.Laws, ch. 342, § 22, which added section 422A.156. This new section gave retroactive effect to the 1978 amendment to section 422A.09, subd. 3(2), and reads as follows:

> From and after February 8, 1980, nothing contained in section 422A.09, subdivision 3, clause (2) shall be construed as allowing payment of a retirement allowance or other retirement benefits other than a disability allowance pursuant to section 422A.18 if otherwise eligible to any former, present or future elective officer of the city of Minneapolis who has not attained the age of at least 60 years unless the elective officer has received credit for at least 30 years of services and retires pursuant to section 422A.15, subdivision 1.

The state argues that the revisions of the municipal employees pension statutes from 1937 to the present indicate a strong trend towards equalizing the pension benefits eligibility requirements for elected city officials and other municipal employees. The state concludes from this trend that the provisions relating to "employees" and "members of the contributing class" which have long imposed a minimum age require-

ment were also intended to apply to "elective city officers." The flaw in the state's argument is its failure to consider the definitions set forth in section 422A.01, subds. 3 and 11, defining "retirement allowance" and "employee" and section 422A.09, subds. 1 and 3, defining the "exempt class." Taken together, these provisions make clear that although the eligibility requirements for members of the contributing class and for elected city officers have become increasingly similar, these two categories have always been and remain separate and distinct within the framework of chapter 422A. It is clear from the statutory scheme that the mere fact that an elected city officer opts to become a contributing member does not mean he or she becomes subject to all provisions of chapter 422A governing "employees" and "members of the contributing class."

When elected city officials were first permitted to join the pension plan in 1937 (1937 Minn.Laws, ch. 171, § 1), the service requirement was 20 years with no minimum retirement age stated. In 1963 the service requirement was reduced to 15 years (1963 Minn.Laws, ch. 374, § 1), and in 1969 it was further reduced to 10 years (1969 Minn. Laws, ch. 914, § 3). But on neither occasion was any minimum age requirement stated. Thus, on three occasions over a period of 41 years the legislature had an opportunity to indicate that the statute meant something different than what it appeared to say, namely, that an elected official could receive benefits at any age so long as the service years requirement was met. Yet the legislature imposed no minimum retirement age for elected officials when it lowered the service years requirement, even though a retirement age requirement existed for other city employees. It is certainly not for this court to read into the statute a requirement that the legislature declined to impose during 41 years of the statute's existence.

■ We conclude, as did the trial court, that the 1978 and 1980 amendments to the retirement law must be viewed "as efforts by the legislature to correct its past mis-

takes rather than efforts to clarify what had always been the law." We hold, therefore, that the 1978 amendment imposed for the first time a minimum age for retired elective officers to receive a pension. The 1980 amendment then expressly makes this change applicable "to any former, present or future elective officer of the city of Minneapolis."

## II.

Appellant Christensen argues that he has a right, either in contract or property, to continue receiving his monthly retirement allowance, even though the legislature has changed the age eligibility requirement. He argues that any statute which purports to take away his current right to retirement benefits is unconstitutional, either as an impairment of contract or as a deprivation of property without due process.

The trial court, however, concluded that Minnesota was committed to viewing public pensions as a gratuity, and that, while it would have preferred to rule otherwise, a change, if any, should come from this court. A brief review, then, of our case law is needed.

### A. *Our prior case law.*

In 1914 this court, in *Gibbs v. Minneapolis Fire Department Relief Ass'n,* 125 Minn. 174, 145 N.W. 1075 (1914), held that the legislature could amend the definition of "widow" in the pension law to make plaintiff, an employee's widow, ineligible for both accrued and future payments. Quoting cases from other jurisdictions holding a public pension to be a gratuity, we said that "[a]s against the state there is no vested right in the pension accruing in the future from month to month. It may be taken away." 125 Minn. at 176, 145 N.W. at 1076. In *Hessian v. Ervin,* 204 Minn. 287, 283 N.W. 404 (1939), we rejected the challenge of an employee to a pension statute calling for mandatory deductions from the employee's salary and to a claim that the pension fund was actuarially unsound; we reasoned that the employee had no vested right in the pension fund at least until he had

retired and perhaps then only as to those payments already accrued. In *Johnson v. State Employees' Retirement Ass'n,* 208 Minn. 111, 292 N.W. 767 (1940), we unequivocally adhered to the gratuity approach in declining to find a vested right in public pensions, although there the statute in effect at the time the annuity was reduced expressly provided that "the retirement board may ratably reduce such annuities whenever the condition of the maintenance fund shall require such reduction."

In *Halek v. City of St. Paul,* 227 Minn. 477, 480, 35 N.W.2d 705, 706–07 (1949), we declined to find a vested right in paid sick leave for public employees and, in so doing, observed that *Johnson* holds that "statutory provisions for payment by a governmental authority to public employees of retirement pensions create no contractual or vested rights, but on the contrary constitute the grant of a gratuity terminable at the will of the grantor * * *." In *Slezak v. Ousdigian,* 260 Minn. 303, 309, 110 N.W.2d 1, 5–6 (1961), in denying plaintiff employees the right to an accounting from the defendant secretary of PERA, we observed that "[t]he presumption is that a statute or an ordinance granting a gratuity to a public employee such as a retirement pension is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature or city council shall ordain otherwise." Most recently, in *Halverson v. Rolvaag,* 274 Minn. 273, 143 N.W.2d 239 (1966), in defining the nature of a survivor's interest in federal benefits arising from the death of a national guardsman, we noted that the defendant relied on the line of cases beginning with *Gibbs* holding a public pension to be a gratuity but distinguished these cases as not being in point.

On the other hand, in another line of cases this court has intimated that it is predisposed towards joining the strong trend away from the gratuity theory and towards the contract theory of employees' rights in public pensions. *See Donaldson v. Mankato Policemen's Benefit Ass'n,* 278 N.W.2d 533 (Minn.1979); *Fassbinder v.*

Minneapolis Fire Department Relief Ass'n, 254 N.W.2d 363 (Minn.1977); *Sandell v. St. Paul Police Relief Ass'n,* 306 Minn. 262, 236 N.W.2d 170 (1975); *Sylvestre v. State,* 298 Minn. 142, 214 N.W.2d 658 (1973); *State ex rel. Gorczyca v. City of Minneapolis,* 174 Minn. 594, 219 N.W. 924 (1928); *Stevens v. Minneapolis Fire Department Relief Ass'n,* 124 Minn. 381, 145 N.W. 35 (1914).

In *Gorczyca* we held that public pensions were not a gratuity and that the pension statute becomes a part of the employee's contract of employment. In *Sylvestre* we stated that our cases using the gratuity approach did not involve retirement benefits for judges and, noting the special constitutional provisions applicable to judges, went on to apply a contractual analysis to judges' pensions. In *Sandell* we again used a contract approach in analyzing the nature of the public pensioner's interest. There we denied plaintiff employees the right to withdraw their contributions to the pension fund on leaving public employment before qualifying for retirement benefits because, since neither the articles or bylaws of the relief association, nor the pension law gave an employee a right to the return of his contributions, plaintiffs were not "contractually entitled" to a refund.

In *Stevens v. Minneapolis Fire Department Relief Ass'n,* 124 Minn. 381, 145 N.W. 35 (1914), the relief association discontinued the plaintiff pensioner's disability pension without a hearing on the ground that plaintiff was no longer disabled. The relief association defended on the ground that since a pension was a gratuity no hearing was required. We held that due process required a hearing. *Stevens,* however, does not involve a retroactive change in the pension rules but only a failure to apply the existing rules fairly.

Thus we see that our case law over the years has not remained wedded to the gratuity approach, but has at times, without always articulating the reasons therefor, used a contract analysis. We also might observe that another section of chapter 422A reveals that the legislature was aware that rights of some kind could vest under its retirement program. Minn.Stat. § 422A.25 (1982) provides in part:

> Nothing contained in sections 422A.01 to 422A.25 shall be construed as diminishing, limiting or modifying any *vested right* of an employee, annuitant or beneficiary to a retirement allowance, annuity or pension acquired under the law existing prior to May 1, 1975.

(Emphasis added.) We agree with the state that this proviso fails to define "vested rights" and, therefore, begs the question before us. Nonetheless, this section indicates that the legislature may have recognized that the gratuity theory of public pensions has no force today. In any event, it is time to put our analysis of public pension cases on a sounder, more consistent, conceptual basis.

B. *The nature of the employees' interest.*

■ 1. First of all, we abandon the notion that retirement benefits in the public sector are nothing more than a gratuity. In the past the gratuity theory may have been justified by the fact that promised benefits were insignificant in amount. *See* Note, *Public Employee Pensions in Times of Fiscal Distress,* 90 Harv.L.Rev. 992, 997 (1977). But times have changed. It is estimated that in 1942 less than half of the 3.2 million state and local government employees had some kind of a public retirement program, while by the 1960's about 75% of some 7 million public employees had such coverage. Cohn, *Public Employee Retirement Plans—The Nature of the Employees' Rights,* 1968 Ill.Law Forum 32, 33 n. 3. Since then pension coverage has increased while at the same time, particularly in the last two decades, increasing numbers of public employees are reaching retirement age and finding that pension funding is not always adequate to provide what has been promised. *See, e.g.,* Fritz, *The Growing Challenges of Providing Pensions to State and Local Civil Servants in an Aging Society,* 3 Int'l J. of Pub.Adm. 405 (1981).

In 1914, when public pension benefits tended to be nominal by today's standards and when governmental policy was more

*laissez faire,* we quoted in *Gibbs* from an Illinois case that "[a] pension is a bounty springing from the graciousness and appreciation of sovereignty." 125 Minn. at 177, 145 N.W. at 1077. Today, that language is at best quaint, and at worst, demeaning. Retirement plans are now an accepted and expected part of one's employment, whether public or private. To attract and retain good employees, employers need to provide competitive retirement programs. Employees in the public sector undertake employment, at times on less favorable terms than in the private sector, with the expectation that they will have a measure of security in their retirement years. As one commentator puts it:

> The universally recognized primary objectives of retirement plans are to enable the employer to attract better employees, to reduce turnover, to facilitate orderly retirement of older employees, to retain valuable employees who might seek more productive employment elsewhere, and, most importantly from the employee viewpoint, to assure a measure of income upon retirement adequate to allow the annuitant to live in reasonable security. These objectives, of increasing importance in private employment, are even more critical in government personnel policy as, with few exceptions, government cannot compete with private industry salary levels, and must rely heavily upon the equalizing factor of an attractive and liberal retirement plan.

Cohn, *Public Employee Retirement Plans— The Nature of Employees' Rights,* 1968 Ill.Law Forum 32 at 40. We therefore expressly overrule *Gibbs v. Minneapolis Fire Department Relief Ass'n,* 125 Minn. 174, 145 N.W. 1075 (1914), and those cases which follow its holding, relying on the gratuity theory.

2. We think today a public employee's interest in a pension is best characterized in terms of promissory estoppel. This approach is presaged, to a degree, by our previous holdings using the contract approach, to which promissory estoppel is related. Thus, in *Gorczyca v. City of Minneapolis,* 174 Minn. 594, 598, 219 N.W. 924, 925 (1928), employing a contract approach, we held:

> [A pension or retirement allowance] is not a gratuity when the services are rendered while the pension or retirement relief statute is in force, so that the statute becomes a part of the contract of employment and contemplates such pension or allowance as part of the compensation for the services rendered.

Then in *Sylvestre v. State,* 298 Minn. 142, 214 N.W.2d 658 (1973), we characterized the relationship between the state and its district court judges with respect to pensions as contractual. We there reasoned that the assumption of judicial office in response to the state's offer of a pension constitutes the commencement of performance by the judge of a unilateral contract and makes the state's offer binding subject to completion of the performance for the specified period of time. *Sylvestre* is, of course, different from this case in that it involved the pensions of district court judges, whose office has a constitutional basis and whose compensation cannot be constitutionally reduced during continuance in office. *Sylvestre* is nevertheless instructive in its use of a contract approach to define the pension interest of public employees.

We do not think, however, that the conventional contract approach provides an appropriate analysis for public pensions generally. In jurisdictions which have adopted the contract approach, usually the state constitution or state statutes have expressly defined the pension relationship between the state and its employees as contractual. *See, for example, Opinion of the Justices,* 364 Mass. 847, 303 N.E.2d 320 (1973); *Birnbaum v. New York State Teachers Retirement System,* 5 N.Y.2d 1, 152 N.E.2d 241, 176 N.Y.S.2d 984 (1958). A conventional contract approach, with its strict rules of offer and acceptance, tends to deprive the analysis of the relationship between the state and its employees of a needed flexibility. *See* Note, *Public Employee Pensions in Times of Fiscal Distress,* 90 Harv.L.Rev. 992, 998 (1977). Nor do we think characterizing the pension interest as a kind of prop-

erty right, as the retirement board here urges, is appropriate. To afford protection for a property interest, moreover, would involve an extension of the somewhat dubious doctrine of "substantive" due process.

It is clear that the state and its political subdivisions, by legislation enacted by the state legislature, can make an offer or promise to its employees, and that with respect to a pension, it has done so. *See Sylvestre.* Part of the problem is that in making an "offer" the state may, at the same time, say that it is not creating any contract rights. Thus, Minn.Stat. § 353.38 (1982) of the Public Employees Retirement Association (PERA) provides, "Nothing done under the terms of this chapter and acts amendatory thereof shall create or give any contract rights to any person * * *." *See also* Minn.Stat. § 354.07, subd. 8 (1980), the Teachers Retirement Association ("No provision of this chapter shall create or give any contract rights to any person") and Minn.Stat. § 352.022 (1982), the Minnesota State Retirement System ("No provision * * * shall create or give any contract rights to any person").

With respect to the fund involved here, the Minneapolis Municipal Employees Retirement Plan, the statutory scheme is similar to that for judges' pensions in that it does not contain a disclaimer of contract rights. This raises the question of whether the unilateral contract analysis used in *Sylvestre* might not then be extended to this case. We do not, however, reach that question, nor need we decide at this time if promissory estoppel might not also apply to judicial pensions in a *Sylvestre* setting; it is enough for now that we find that promissory estoppel affords the appropriate analytic approach here.

First of all, it should be noted that the statutory disclaimers of pension contract rights do more than simply reserve the state's right to amend or modify its contractual promise from time to time; instead, the disclaimers purport to deny the creation of any contract right at any time. If this is true, then the state's promise is illusory; it is dependent once again on the "graciousness and appreciation of sovereignty" (or the lack of it)—an archaic notion of a gratuity, which we have rejected.

■ We do not think this is what the legislature intended. We think the legislature intended that public employees have a "right" to the offered pension, that this "right" is a protectable entitlement though subject to the paramount interest of the state to modify it in the public interest, but that this right is not to be defined by strict conventional contract principles.[2]

It is in this context, which we think is realistic, fair and practical, that we decide to judge the state's promise by the doctrine of promissory estoppel. In *Del Hayes & Sons, Inc. v. Mitchell,* 304 Minn. 275, 283, 230 N.W.2d 588, 593 (1975), we explained that:

> Promissory estoppel is the name applied to a contract implied in law where no contract exists in fact. The effect of promissory estoppel is to imply a contract from a unilateral or otherwise unenforceable promise coupled by detrimental reliance on the part of the promisee.

(Footnotes omitted.) In other words, promissory estoppel precisely applies where, as here, there are no "contract rights." We have held, for example, that it applies where a promise is illusory. *See Grouse v.*

2. This is partly borne out by the purpose clause of the Public Employment Labor Relations Act of 1971, wherein the legislature states its purpose is "to promote *orderly and constructive relationships* between all public employers and their employees, *subject however, to the paramount right* of the citizens of this state to keep inviolate the guarantees for their health, education, safety and welfare" and recognizes the "need of cooperation and *employment protection*" in the public sector. *See* Minn.Stat. § 179.61 (1982) (emphasis added).

Thus PELRA grants public employees the right to organize and bargain. But here again, in defining what are the negotiable "terms and conditions of employment," the legislature excluded "retirement contributions or benefits." Minn.Stat. § 179.63, subd. 18 (1982). This exclusion does not mean that retirement laws are not an item intended to be entitled to "employment protection," but only that in this important area the public employer will not negotiate but reserves to itself the granting of pension terms.

*Group Health Plan, Inc.,* 306 N.W.2d 114, 116 (1981). The Restatement (Second) of Contracts § 90 (1981) defines the doctrine as follows:

A promise which the promissor should reasonably expect to induce action or forbearance on the part of the promissee * * and which does induce such action or forbearance is binding if injustice can be avoided only by the enforcement of the promise.

In the realities of the modern employment marketplace, the state reasonably expects its promise of a retirement program to induce persons to accept and remain in public employment, and persons are so induced, and injustice can be avoided only by enforcement of that promise. Promissory estoppel, like equitable estoppel, may be applied against the state to the extent that justice requires. *See Mesaba Aviation Division v. County of Itasca,* 258 N.W.2d 877, 880 (Minn.1977) (equitable estoppel applies against the state); *Construction Supply Co. v. Bostrom Sheet Metal Works,* 291 Minn. 113, 120, 190 N.W.2d 71, 75 (1971) (promissory estoppel is "a doctrine based on reliance which courts may use in a proper case to prevent injustice").

In applying promissory estoppel, two factors must be kept in mind: (1) What has been promised by the state? and (2) to what degree and to what aspects of the promise has there been reasonable reliance on the part of the employee? Not every promise in all its implications is necessarily enforceable under promissory estoppel. Estoppel applies only to avoid injustice. Here the state has not promised its employees any pension as a matter of contract right. What it has promised and what its employees have relied on, and what, therefore, the law will enforce, is a pension program, the terms of which are protectable subject to reasonable legislative modification from time to time.

We now apply these principles to this case. In 1966 appellant Christensen voluntarily became a member of the contributing class of the fund. It was at this point, when he elected to become eligible for pension benefits, that the state was estopped from denying its promise to provide then-existing pension benefits prescribed by statute, subject to reasonable legislative modification upon Christensen's satisfaction of eligibility requirements. The statutes in effect at that time imposed a 15-year service requirement which Christensen proceeded to and thereafter did satisfy. In 1969 the legislature reduced the service requirement to 10 years. On January 4, 1974, Christensen left municipal service and at that time elected to receive his retirement benefits on a monthly basis rather than a lump sum. At no time while he was in municipal service did the legislature modify its promise of a pension by attempting to impose a minimum age requirement. Not until Christensen had completed the requirements specified for receipt of his pension and he had retired did the legislature attempt to modify its promise to Christensen by saying that he must now reach age 60 before he could receive any more monthly benefits. Under these circumstances, we hold that appellant Christensen has a protectable pension entitlement and that the state's promise of a pension to be paid when he retired, as defined by the statutes existing in January 1974, is binding on the state.

### III.

Although a promise may be deemed enforceable against the public employer by reason of promissory estoppel, the inquiry does not end there. A promise enforced by estoppel, like a contract, contains an implied condition that the terms are subject to modification under the state's police power. For example, in *Minneapolis Gas Co. v. Zimmerman,* 253 Minn. 164, 184, 91 N.W.2d 642, 645 (1958), we said, "[A]ll contracts made by the state are entered into subject to the implied condition that they are ever subordinate to a reasonable and proper exercise of the state's inalienable police power." This exercise of the police power is, however, itself constrained by the federal and state constitutional prohibition against the passage of a law that

impairs the obligations of contract. We hold that the state constitution's impairment of contract clause, Minn. Const. art. I, § 11, applies to an implied-in-law obligation created by promissory estoppel. As recognized by the Restatement, promises rendered binding through estoppel are entitled to the normal enforcement remedies of general contract law. Restatement (Second) of Contracts § 90 comment d (1981).[3] The question thus presented is whether the enactment of Minn.Stat. § 422A.156 (1982) is invalid as an unconstitutional impairment of the state's obligation, imposed by principles of estoppel, to provide the pension it promised.

■ The approaches of promissory estoppel and the impairment-of-contract clause appear to overlap. Promissory estoppel, however, focuses on the reasonableness of the employee's reliance to create a contractual obligation,[4] while the contract clause assumes the existence of a contract and determines whether the state may alter its terms, based on the reasonableness of the state's actions when balanced against the employee's interests.

The federal constitutional prohibition against contract impairment, U.S. Const., art. I, § 10, cl. 1, has been construed to mean that the state reserves some power to modify contract terms when the public interest requires. *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978); *United States Trust Co. v. New Jersey,* 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977); *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). Or as the Eighth Circuit has stated:

However, the contracts clause is a viable restriction of the powers of the States, and if a State undertakes to alter substantially the terms of a contract, it must justify the alteration, and the burden that is on the state varies directly with the substantiality of the alteration. A serious alteration of the terms of a contract resulting from state legislation is permissible if, but only if, the legislation is necessary to meet a broad and pressing social or economic need, if the legislation is reasonably adopted for the solution of the problem involved, and if it is not over broad or over harsh.

*White Motor Corp. v. Malone,* 599 F.2d 283 at 287 (8th Cir.1979). See also *Minneapolis Gas Co. v. Zimmerman, supra; Naftalin v. King,* 252 Minn. 381, 389; 90 N.W.2d 185, 191 (1958).

The United States Supreme Court has recently enunciated a three-part test to determine when a contractual impairment is unconstitutional. *Energy Reserves Group v. Kansas Power & Light,* —— U.S. ——, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983). The initial question is whether the state law has, in fact, operated as a substantial impairment of a contractual obligation. The severity of the impairment increases the level of scrutiny to which the legislation is sub-

---

**3.** In accord is *Opinion of the Justices,* 364 Mass. 847, 303 N.E.2d 320 (1973), where the Massachusetts Supreme Court held that the contractual relationship created by the public pension was covered by the impairment-of-contract clauses in the federal and state constitutions. The Massachusetts court observed that in the legislative pension area the term "contract" should be understood in a special sense and that "[w]hen, therefore, the characterization 'contract' is used, it is best understood as meaning that the retirement scheme has generated material expectations on the part of employees and these expectations should in substance be respected." 364 Mass. at 861, 303 N.E.2d at 328. This contract, in the special sense used by the Massachusetts court, is really, it seems to us, an application of promissory estoppel.

**4.** "The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice. Satisfaction of the latter requirement may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant." Restatement (Second) of Contracts § 90 comment b (1981).

jected. If there is a substantial impairment, the state, at the second step, must demonstrate a significant and legitimate public purpose behind the legislation. Third, the state's action is examined in the light of this public purpose to see "whether the adjustment of the rights and responsibilities of the contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." 103 S.Ct. at 705–06 (brackets in original). This three-part test is applied with more scrutiny when the state seeks to impair a contract to which it is a party than when it regulates a private contract since "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 26, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92 (1977). *See also Energy Reserves Group*, 103 S.Ct. at 705–06 n. 14.

The reasonableness and necessity of legislative action affecting pension benefits requires a balance or adjustment of the competing interests involved. At stake is the need for public employees to be secure in their retirement programs and, on the other hand, the public's concern with the integrity of the pension fund and the state's overall fiscal soundness.

With respect to the employee's claim of a need for security in his retirement benefits, the state argues that here the employee cannot claim any justifiable reliance on his promised retirement entitlement because it is not reasonable for an employee to rely on a promise of a lifelong pension prior to age 60. In support of this argument, the state points out that the understood purpose of a pension system is to provide income for disability or for the time when the employee's working days are over. Since, it is argued, this purpose is not served by Christensen's "early" pension, consideration of Christensen's needs ought to yield to the state's countervailing interests. These interests are that in enacting section 422A.156, the legislature presumably was attempting to correct its past mistakes, realizing that to pay pensions to retired elected city officials after only 10 years of service and regardless of age is unfair, especially since other city employees must wait until age 60, and further realizing that the pension for retired elected officials is actuarially unsound. The record, in fact, shows that appellant Christensen paid $7,051.51 into the retirement fund but has already received benefits of $27,380.86, and that the actuarial value of appellant's retirement allowance as of May 1, 1980, the date payments were terminated, was $73,872.61. In its pleadings, the retirement board alleges that, for all nine retirees in Christensen's situation, there will be an unfunded liability of $258,655.02, for which the state is liable.

Applying the *Energy Reserves* three-part test to these claims makes it obvious that the state's concern in correcting any inequities in the city's pension plan must yield to the employee's need to be secure in his expected retirement benefits. First, the suspension of retirement benefits until age 60 is a substantial impairment of the contract terms. It may be a prudent alteration; correcting an inequity or a fiscal misjudgment can be a significant and legitimate public purpose, as the second prong of this test requires.

When this alteration is applied, however, to former city officers, like appellant, who have already left city employment and are relying on their monthly pension benefits for living expenses, we do not think that the need for a minimum age requirement is so compelling, or is such a reasonable condition appropriate to the public purpose claimed as to justify impairment of the state's obligation. There is no claim that the integrity of the pension fund or of the overall state budget is so affected that the obligation to Christensen and those similarly situated cannot reasonably be kept. Only nine persons, including Christensen, are affected by section 422A.156. If, as the trial court suggested, the interest at stake is correcting previous errors of legislative judgment by equalizing the age eligibility requirements for all persons who contribute to the city's retirement fund, then the inter-

est may be served sufficiently by less drastic alternatives, for instance, by applying section 422A.156 only to elected officials joining the pension plan after enactment of the section. Thus, the statute fails on the third prong of the three-part test. Whether or to what extent the section applies to elected city officers who were employed at the time of its enactment and remain currently employed is not before us.

We hold, therefore, that Minn.Stat. § 422A.156 (1982) is invalid as an unconstitutional impairment of contractual obligations to the extent that it purports to apply to elected city officials, such as appellant, already retired at the time of its enactment.

Reversed.

