Earl D. JACOBSEN, et al., Respondents,

v.

ANHEUSER–BUSCH, INCORPORATED, Appellant.

No. C7–85–2105.

Supreme Court of Minnesota.

Aug. 29, 1986.

Rehearing Denied Oct. 30, 1986.

Steven W. Schneider, Duluth, Lawrence C. Brown, Thomas H. Bennin, Minneapolis, for Anheuser Busch.

David R. Oberstar, Joseph J. Mihalek, Duluth, for Earl Jacobsen.

Roland C. Amundson, David S. Johnson, Michael D. Madigan, Minneapolis, amicus curiae for Mn. Beer Wholesalers Assn.

KELLEY, Justice.

This case comes to us as a certified question. The question is: Does the Minnesota Beer Brewers and Wholesalers Act, Minn. Stat. §§ 325B.01, *et seq.*, applied retroactively to a preexisting agreement between a brewer and a wholesaler as mandated by Minn.Stat. § 325B.15, unconstitutionally impair the parties' rights and obligations set forth in that preexisting agreement under art. I, § 10 of the Constitution of the United States and art. 1, § 11 of the Constitution of the State of Minnesota? The trial court denied Anheuser-Busch's motion to dismiss an action commenced by a wholesaler and its vendee seeking damages under Minn.Stat. § 325B.01 et seq. In so doing, it ruled that the Act did not unconstitutionally impair a contract between An-

heuser-Busch and its wholesaler, and certified the constitutional question as important and doubtful under Minn.R.Civ.App.P. 103.03(h).[1] We answer the certified question in the affirmative and reverse.

Anheuser-Busch, Inc., appellant, is a brewer of malt beverages such as Michelob and Budweiser beer.[2] Its products are marketed through intermediate wholesalers who distribute the products to retailers for sale to consumers. In 1976, Earl D. and Ernest R. Jacobsen (Jacobsens) owned Saratoga Distributing Company (Saratoga). In September of that year, appellant and Saratoga entered into a written contract entitled "Anheuser-Busch Wholesaler Equity Agreement." Thereafter, and subject to the terms of that contract, Saratoga became the wholesaler for Anheuser-Busch products in the Duluth sales territory. Because Anheuser-Busch was cognizant of the fact that a wholesalership could significantly affect sales of its products, it reserved to itself the right to approve or disapprove a change in ownership of the wholesale distributorship. Moreover, Anheuser-Busch under the contract had the right to terminate the contract if it did not approve an ownership transfer.[3]

Approximately nine months after the execution of the contract, the Minnesota Beer Brewers and Wholesalers Act, Minn.Stat. ch. 325B.01 *et seq.*, became effective. Section 325B.06 of the Act provides:

No brewer shall unreasonably withhold consent to any assignment, transfer or sale of the wholesaler's business whenever the wholesaler to be substituted meets the material and reasonable qualifications and standards required of its wholesalers.

1. The court of appeals certified the question to this court and requested accelerated review under Minn.R.Civ.App.P. 118, subd. 1 and Minn. Stat. § 480A.10, subd. 2(b). We granted the request.

2. The parties have agreed to a statement of the record pursuant to Minn.R.Civ.App.P. 110.04.

3. Contract provisions relevant to change in ownership provide:

4. OWNERSHIP OF WHOLESALER:

Although this is a personal service agreement and the participation of Manager is vital to both parties, the ownership of Wholesaler is also important because it is the owner or owners who have the right to establish basic policies and have the responsibility of providing financing, manpower, equipment and facilities for the effective operation of the business. Moreover, Anheuser-Busch has always looked to the owner (even though he may not be the Manager) of a wholesalership to maintain an active interest in the business, to be knowledgeable at all times of the operation and to regularly supervise the work of the Manager. Therefore, because the identity of the owner(s) could also have a significant effect on the sale of Anheuser-Busch Products, the parties agree as follows:

(a) Unless Wholesaler shall have obtained the prior written approval of Anheuser-Busch to a proposed change in ownership of Wholesaler under the provisions of the following subparagraph (b), this Agreement shall terminate whenever there is a change in the ownership of Wholesaler which results in a change in the control of Wholesaler's business. * * *

(b) Wholesaler shall have the right to request from Anheuser-Busch written approval in advance of any proposed transfer of ownership interest. * * * [I]f the Request for Approval of Proposed Change in Ownership furnishes Anheuser-Busch with sufficient information to enable it to pass upon the proposed change in ownership, then within 30 days after the Request form has been received, Anheuser-Busch shall notify Wholesaler in writing whether it approves or disapproves the proposed change in ownership; (iii) in the event Anheuser-Busch decides that it needs additional information from Wholesaler in order to determine whether to approve the proposed change in ownership, * * * [w]holesaler shall submit such additional information as promptly as possible; (v) within 30 days after the date on which all such additional information has been received, Anheuser-Busch shall notify Wholesaler in writing whether it approves or disapproves the proposed change in ownership. * * *

\* \* \* \* \* \*

16. COMPLIANCE WITH LAW:

The provisions of this Agreement are subject to and shall be governed by the laws of the jurisdiction in which Wholesaler's principal place of business is located. * * * The laws, rules and regulations of the jurisdiction in which Wholesaler conducts its business, to the extent that they may now or hereafter bear upon the contractual relationships between Wholesaler and Anheuser-Busch, are hereby incorporated in this Agreement and made a part hereof. * * *

The Act is made expressly retroactive.[4] Other sections of the Act provide substantial penalties for violation of Section 325B.06.[5] Additionally, the Act authorizes the court to grant equitable relief, award punitive damages and allow attorney fees.[6] It also places other restrictions on brewers vis-a-vis wholesalers.[7]

Approximately six months after the effective date of Minn.Stat. ch. 325B, the Jacobsens negotiated an agreement with Kenneth Stretar, the sole owner of Ribbon Distributing, Inc. (Ribbon), whereby Ribbon would purchase Saratoga. The agreement was contingent upon Ribbon's ability to obtain the consent of Anheuser-Busch to handle its products.

After Saratoga had submitted to Anheuser-Busch a formal request for approval of the proposed ownership change, Anheuser-Busch, citing three reasons, disapproved the proposed transfer.[8]

Thereafter, the Jacobsens and Ribbons sued appellant. Following dismissals of some counts, the only claims remaining in 1985 charged Anheuser-Busch with unreasonable conduct prohibited by Minn.Stat. §§ 325B.01 to 325B.17 (1980).[9] Respondents sought actual and punitive damages plus attorney fees. Anheuser-Busch moved to dismiss. It claimed the retroactive application of the statute, Minn.Stat. § 325B.15 (1984), unconstitutionally impaired the rights and obligations of the parties to the contract executed prior to the Act's effective date under U.S. Const. art. I, § 10 and Minn. Const. art. 1, sec. 11. After "reluctantly" concluding that the impairment of contract did not rise to constitutional dimension, the trial court denied the motion but certified the question as important and doubtful.

We commence our analysis of the issues raised by referring to certain rules applica-

---

4. Section 325B.15 reads:

   The provisions of sections 325B.01 to 325B.17 shall cover agreements in existence on May 28, 1977, as well as agreements entered into after May 28, 1977.

5. Section 325B.07 providing for penalties, insofar as relevant, reads:

   Subdivision 1. Any brewer which * * * unreasonably withholds consent to any assignment, transfer or sale of a wholesaler's business, shall pay the wholesaler reasonable compensation for the value of the wholesaler's business with relationship to the terminated brand or brands. The value of the wholesaler's business shall include, but not be limited to, its good will, if any.

6. Section 325B.08, in part, provides:

   The court may grant equitable relief * * * including, but not limited to, declaratory judgment and injunctive relief. The court may, if it finds that the brewer has * * * unreasonably withheld its consent to any assignment, transfer or sale of the wholesaler's agreement, award punitive damages, as well as actual damages, costs and attorneys fees.

7. For example, a brewer is prohibited from signing an agreement with more than one wholesaler in a sales territory. *See* Section 325B.03.

8. The declination was by letter dated January 18, 1978 from Anheuser-Busch's vice-president of sales operations. Insofar as relevant, it read:

> First, in view of the number of brands currently represented by Ribbon, we fear that the merger of your organization would result in a near monopoly in the wholesale beer market in Duluth. The resulting proliferation of brands would preclude the merchandising and marketing effort which we believe is necessary to improve our market position there. Secondly, our contact with retailers and others close to the Duluth beer market indicates that Mr. Stretar is not well regarded by area retailers. As you know, the maintenance of strong wholesaler-retailer relationships is, in our view, critical to the successful marketing of Anheuser-Busch products.
> Additionally, it is our opinion that the operational plan submitted by Mr. Stretar is wholly inadequate. The marketing strategy which it sets forth would not give our products adequate representation in the Duluth market. For these reasons, we do not feel that it would be in our best interests to approve the transfer of ownership of your company to Mr. Stretar. Please understand that this disapproval is motivated solely by a sincere desire to insure maximum representation of Anheuser-Busch brands in the Duluth market.

9. In the initial complaint, Jacobsens sued individually and as co-trustees under voluntary proceedings for the liquidation and dissolution of Saratoga. Originally the complaint contained four counts. Prior to trial, the court dismissed the Jacobsens' individual claims and a count for tortious interference with contractual relations. A count alleging breach of contract was withdrawn by respondents before trial.

ble in a case where the constitutionality of a legislative act is challenged. Since the certified question is solely a legal one, we need to give no deference to the trial court decision. *Frost-Benco Electric Association v. Minnesota Public Utilities Commission,* 358 N.W.2d 639, 642 (Minn.1984); *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977). However, every legislative enactment comes to the court with a presumption in favor of its constitutionality. *Federal Distillers, Inc. v. State,* 304 Minn. 28, 39, 229 N.W.2d 144, 154 (1975). Therefore, the burden rests with the challenger to demonstrate beyond a reasonable doubt that the challenged Act violates a constitutional provision. *Id.*

Here, the sections of the Minnesota Beer Brewers and Wholesalers Act are challenged by Anheuser-Busch as violating the contract clauses of both the Constitutions of the United States and of Minnesota.[10] Though the language of the contract clauses in both Constitutions is absolute, courts have indicated the prohibitions of such contract clauses must be accommodated to the inherent police power of the state "to safeguard the vital interests of its people." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 410, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983), quoting *Home Building & Loan Associates v. Blaisdell,* 290 U.S. 398, 434, 54 S.Ct. 231, 238, 78 L.Ed. 413 (1934). In *Christensen v. Minneapolis Municipal Employees Retirement Board,* 331 N.W.2d 740 (Minn.1983), we noted and applied the three-part test enunciated in *Energy Reserves,* 459 U.S. at 411–13, 103 S.Ct. at 704–06, to determine whether a contractual impairment was unconstitutional. Using the *Energy Reserve* analysis, a court initially considers whether the state law has,

in fact, operated as a substantial impairment of a contractual obligation. The severity of the impairment increases the level of scrutiny to which the legislation is subjected. *See Christensen* 331 N.W.2d at 750–51. Secondly, if a substantial impairment exists, those urging the constitutionality of the legislative act must demonstrate a significant and legitimate public purpose behind the legislation. *Id.* Finally, the legislature's action is examined in the light of this public purpose to see whether the adjustment of the rights and liabilities of the contracting parties is based upon resaonable conditions and is of a character appropriate to the public purpose justifying the law's adoption. *Id.* [11]

All parties concede that in the wholesale equity agreement with Saratoga, Anheuser-Busch reserved to itself the unrestricted right to approve or disapprove any proposed change in the ownership of Saratoga. The Minnesota Beer Brewers and Wholesalers Act, specifically made retroactive by the legislature, prohibits a brewer from "unreasonably withholding consent" to a sale of a wholesaler's business "whenever the wholesaler to be substituted meets the material and reasonable qualifications and standards required of its wholesalers." Minn.Stat. § 325B.06 (1984). From this language Anheuser-Busch contends that the Act has severely impaired its reasonable contractual expectation by stripping it of its contractual right to freely exercise its business judgment in deciding whether to approve or disapprove a franchise transfer. As the result, Anheuser-Busch points out, it now faces a judicial determination on the reasonableness of its business decision. Accordingly, it argues, the Act replaces its unfettered business discretion with statutory standards, the violation of which

10. U.S. Const. art. I, § 10 provides: "No State shall * * * pass any * * * law impairing the obligation of contracts." Minn. Const. art. 1, § 11 states: "No * * * law impairing the obligation of contracts shall be passed * * *."

11. A suggestion as to the nature and scope of the "significant and legitimate" public purpose is stated by the Eighth Circuit: "A serious alteration of the terms of a contract resulting from

state legislation is permissible if, but only if, the legislation is necessary to meet a *broad* and *pressing* social or economic need, if the legislation is reasonably adopted for the solution of the problem involved, and if it is not over broad or over harsh." *White Motor Corp. v. Malone,* 599 F.2d 283, 287 (8th Cir.1979), *aff'd.* 444 U.S. 911, 100 S.Ct. 223, 62 L.Ed.2d 166 (1979) (emphasis supplied).

makes the company potentially liable for unusual compensatory damages as well as punitive damages, costs, and attorney fees.

To the contrary, the wholesalers assert that the contractual impairment at best was minimal, first, because the Act merely requires a brewer to be reasonable in withholding consent to a transfer of the franchise. Secondly, they assert Anheuser-Busch's reasonable contractual expectations could not have been thwarted given the extreme regulation of the liquor industry in Minnesota. They note the broad police powers given to the states to regulate traffic in liquor under the U.S. Const. amend. XXI, § 2, and likewise cite numerous provisions of the Intoxicating Liquor Act, Minn.Stat. § 340A *et seq.* Accordingly they claim Anheuser-Busch should have anticipated statutory changes regulating termination and transfer of wholesale franchises.[12]

◼ In ascertaining the scope of permissible contractual impairment, courts using the *Energy Reserves* approach will consider whether the industry involved has been regulated in the past. *See, e.g., Energy Reserves,* 459 U.S. at 411, 103 S.Ct. at 704. Without doubt, states possess large powers to regulate not only the importation of liquor from other jurisdictions, but also its intrastate distribution. *See, e.g., California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 107, 100 S.Ct. 937, 944, 63 L.Ed.2d 233 (1980); *State Board v. Young's Market Co.,* 299 U.S. 59, 57 S.Ct. 77, 81 L.Ed. 38 (1936). Nevertheless, while the 21st amendment to the United States Constitution and liquor industry regulations contained in state statutes and regulations may be relevant to the inquiry, they are not dispositive. For example, in *Midcal,* the Supreme Court of the United States in striking down California's wine pricing system as violating the Sherman Act commented:

> Both the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution. Like other provisions of the Constitution, each must be considered in the light of the other, and in the context of the issues and interests at stake in any concrete case.

*Midcal,* 445 U.S. at 109, 100 S.Ct. at 945, quoting *Hostetter v. Idlewild Liquor Corp.,* 377 U.S. 324, 332, 84 S.Ct. 1293, 1298, 12 L.Ed.2d 350 (1964). *See also Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (state statute on beer sales struck on equal protection grounds). Other cases have likewise clearly demonstrated that the 21st amendment does not give the states carte blanc to override other federal constitutional rights. *See, e.g., Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972); *George Benz Sons, Inc. v. Ericson,* 227 Minn. 1, 34 N.W.2d 725 (1948); *Sail'er Inn, Inc. v. Kirby,* 5 Cal.3d 1, 95 Cal.Rptr. 329, 485 P.2d 529 (1971). *See also Federal Distillers, Inc. v. State,* 304 Minn. 28, 229 N.W.2d 144 (1975).

While Anheuser-Busch acknowledges that states have broad regulatory authority over the importation and distribution of liquor within their boundaries, it argues nonetheless that Anheuser-Busch could not reasonably anticipate the adoption of chapter 325B because Minnesota had never previously attempted to regulate a brewer's contractual right to disapprove a wholesaler's proposed change of ownership.[13] Par-

---

**12.** The wholesalers also argue Anheuser-Busch could reasonably have anticipated the state's franchise laws, Minn.Stat. ch. 80C, would, in time, be applied to the brewer-wholesaler relationship. Section 80C.14 of the Franchise Act prohibits unfair practices and requires "good cause" terminations. That a company should foresee a legislature's expansion of a law seems highly speculative. For example in 1984, the legislature repealed section 80C.146 effective July 1, 1986. 1984 Minn.Laws, ch. 444, § 4.

Thus the question is raised whether Anheuser-Busch should have similarly anticipated a repeal of this provision of the Franchise Act.

**13.** Respondents contend that Anheuser-Busch could reasonably anticipate legislation in the nature of chapter 325B because the agreement contained a provision in the contract reading, "The laws, rules and regulations of the jurisdiction in which wholesaler conducts his business to the extent that they may now or hereafter bear upon the contractual relationship between

ticularly it asserts that even if it be conceded the state has the power to enact legislation regulating the terms of distributor contracts, there exists no justification sufficient to permit its retroactive application so as to impair contracts entered into antecedent to the effective date of the legislation.

The courts of several sister jurisdictions which have considered somewhat similar statutes or regulations which attempt to proscribe terminations or transfers of this nature have held such attempts to violate impairment of contract clauses of federal or state constitutions. *See, e.g., Globe Liquor Co. v. Four Roses Distiller's Co.*, 281 A.2d 19 (Del.Supr.1971) (statute invalid as impairment of obligation of contract because of substantive changes the Act made in the rights and obligations of a distributor's contract); *United States Brewers' Association v. State*, 192 Neb. 328, 220 N.W.2d 544 (1974) (statute declared unconstitutional invasion of personal and property rights). Other jurisdictions have sustained the validity of similar statutes by holding the legislative enactments were not applicable to contracts in existence at the effective date of the statute, or in other words that they were not retroactive. *See, e.g., Superior Motors, Inc. v. Winnebago Industries, Inc.*, 359 F.Supp. 773 (D.S.C. 1973); *AFA Distributing Co., Inc. v. Pearl Brewing Company*, 470 F.2d 1210 (4th Cir. 1973); *Wipperfurth v. U-Haul Co. of Western Wisconsin*, 101 Wis.2d 586, 304 N.W.2d 767 (1981).

Absent Minn.Stat. ch. 325B with its retroactivity provision, Anheuser-Busch's disapproval of the transfer of the wholesale agreement would have afforded no legal recourse to Saratoga or Ribbon. The fact the disapproval gave rise to no liability based upon the contract is evidenced by respondents' voluntary withdrawal of the contract claim. Instead of being able to invoke a contract provision that was legal

under the law at the time the contract was executed, the brewer now faces a trial based solely on claimed violation of the Minnesota Beer Brewers and Wholesalers Act with a measure of damages nonexistent under the prior contract law, plus possible exposure to punitive damages not available under prior contract law, *Barr/Nelson, Inc. v. Tonto's, Inc.*, 336 N.W.2d 46, 52 (Minn.1983) (punitive damages for breach of contract are not available under either common law or Minn. Stat. § 549.20), plus an award of attorney fees normally not heretofore recoverable in this type of action, *Barr/Nelson*, 336 N.W.2d at 53; *Jacobs v. Rosemount Dodge-Winnebago South*, 310 N.W.2d 71, 79 (Minn.1981) (Both cases cite that this court has "long held that attorney fees are not recoverable in litigation unless there is a specific contract permitting or a statute authorizing such recovery."). In our view this indeed constitutes a substantial impairment.

■ Nevertheless, even if the Act constitutes a substantial impairment of contract, if there exists a significant and legitimate purpose behind the statute such as "remedying of a broad and general social or economic problem," the Act may yet be sustained because the successful establishment of the existence of a legitimate public purpose serves to provide evidence that the state in enacting the regulation was exercising its police power instead of providing a benefit to special interests. *Energy Reserves*, 459 U.S. at 411–12, 103 S.Ct. at 704–05.

■ Here, however, there exists absolutely no showing that the disruption of the contractual expectations of Anheuser-Busch and Saratoga was necessary to meet any important, broad, and general economic or social problem. Instead, the Minnesota Beer Brewers and Wholesalers Act has all the earmarks of narrow special in-

---

wholesaler and Anheuser-Busch is hereby incorporated in this agreement and made a part hereof." Reading this provision in historical context, however, makes clear that this provision affects the relationship between Anheuser-

Busch and Saratoga insofar as it bears on duties, prohibitions, etc. of each relative to the laws governing the marketing of beer in Minnesota.

terest legislation devoid of any broad public purpose. Since 1973 in Minnesota it has been the policy of this state expressed through legislative enactment that exclusive wholesale distributorships be abolished to meet the social end of elimination of monopolistic practices and to promote price competition. 1973 Minn.Laws 664 § 3.[14] *See Federal Distillers, Inc. v. State,* 304 Minn. 28, 229 N.W.2d 144 (1975). Likewise, the Cash Beer Law, Minn.Stat. § 340.405 (1980), which prohibits brewers and wholesalers from extending credit to retailers of intoxicating malt liquors was addressed to the same general social policy of prevention of vertical integration of the intoxicating malt beverage industry, thereby promoting competition and restricting monopolistic market power. *Haskell's, Inc. v. Sopsic,* 306 N.W.2d 555 (Minn.1981). In contrast to these statutes reflecting this anti-monopolistic public policy, the Minnesota Beer Brewers and Wholesalers Act on its face is anti-competitive, contrary to the long-standing public policy of the state. Instead, it appears to be primarily special interest legislation in favor of the wholesaler distributors. Indeed, an examination of the legislative history reveals that this legislation arose not in response to any broad and general social or economic problem, but rather at the instigation and promotion of beer distributors. The prime arguments of sponsors for its enactment on the floors of the legislature demonstrate that this was an act promoted by and to serve wholesale beer distributors.[15]

We can ascertain "no significant or legitimate public purpose" in the Act. While it may remedy a perceived problem of beer wholesalers, it was obviously not intended to remedy a "broad and general social or economic problem" contemplated by the

language of *Energy Reserves.* It should be kept in mind, however, that the issue here is not whether the legislature could regulate prospectively contracts of this nature, but rather whether the statute can be retroactively applied absent a "significant and legitimate public purpose." We address no other issue than that in this opinion.

Having ruled that there was no "significant and legitimate public purpose" to be remedied by the Minnesota Beer Brewers and Wholesalers Act, it is unnecessary to address the third part of the *Energy Reserves* test.

Accordingly, our answer to the certified question is that the Minnesota Beer Brewers and Wholesalers Act, Minn.Stat. § 325B.01, et seq. applied retroactively to a preexisting agreement between a brewer and a wholesaler as mandated by Minn. Stat. § 325B.15 does unconstitutionally impair the parties' rights and obligations set forth in that preexisting agreement, U.S. Const. art. I, § 10 and Minn. Const. art. 1, § 11.

Reversed.

YETKA, J., dissents.

YETKA, Justice (dissenting).

The states are given broad police powers in regulating traffic in liquor under U.S. Const. art. XXI, § 2. Moreover, even without the passage of this act, it appears to me that plaintiffs here would have a right to recourse on the grounds that there must be some reasonable basis for denying the transfer of the franchise. The agreement between the parties itself states that Anheuser-Busch agrees to abide by both existing and future amendments to the liquor laws of Minnesota.

14. This section is now coded in Minn.Stat. ch. 340A (1985 Supp.) known as the Intoxicating Liquor Act. In chapter 340A.307, that Act requires all importers to offer for sale on an equal basis to all licensed wholesalers all intoxicating liquors brought into the state. The Minnesota Beer Brewers and Wholesalers Act effectively carves out an exception to the liquor act by disallowing dual distribution of a particular brand within a sales territory. *See* Minn.Stat.

§ 325B.03 (1984). *See also* Minn.Stat. § 645.26, subd. 1 (if irreconcilable provisions, special provision shall prevail and be construed as exception to general provision).

15. The bill introduced in the senate was originally an amendment to Chapter 80C, the Minnesota Franchise Law. It is not exactly clear why it was codified as chapter 325B.

The laws, rules and regulations of the jurisdiction in which Wholesaler conducts its business, to the extent that they may now or hereafter bear upon the contractual relationships between Wholesaler and Anheuser-Busch, are hereby incorporated in this Agreement and made a part hereof.

Anheuser-Busch Wholesaler Equity Agreement § 16.

Accordingly, in my opinion, the Minnesota act ought to be upheld.