## HOUSING AND REDEVELOPMENT AUTHORITY OF CHISHOLM, Minnesota, Appellant,

v.

## Carolee E. NORMAN, Respondent.

### No. A03–1613.

Supreme Court of Minnesota.

May 19, 2005.

Thomas F. Andrew, Brown, Andrew & Signorelli, P.A., Duluth, MN, for Respondent.

Christina L. Clark, Debra M. Corhouse, St. Paul, MN, Amicus Curiae Education Minnesota.

Joseph E. Flynn, Jennifer K. Earley, Mendota Heights, MN, Amicus Curiae Minnesota School Boards Association.

Gregg M. Corwin, Jennifer J. Duchscherer, St. Louis Park, MN, Amicus Curiae AFSCME Councils 6 and 14 and MAPE.

## OPINION

HANSON, Justice.

We review the question of whether appellant Chisholm Housing and Redevelopment Authority (CHRA) is obligated to continue to pay health insurance premiums for the benefit of respondent Carolee E. Norman, a retired former employee. Norman bases her claim on a promise from CHRA, contained in a collective bargaining agreement (CBA) in effect when she retired, to pay the health insurance premiums for qualified employees. CHRA argues that Minn.Stat. § 179A.20, subd. 2a (2004), limits the authority of CHRA to obligate itself to pay retiree healthcare costs beyond the term of the CBA, which expired in September 1995, and that Norman thus could not reasonably rely on the promise in the CBA. The district court granted summary judgment for Norman and the court of appeals affirmed. *Norman v. Housing and Redev. Auth. of Chisholm*, 681 N.W.2d 376 (Minn.App.2004). Both courts determined that section 179A.20, subdivision 2a, was overridden by the more specific and subsequently-enacted Minn.Stat. § 471.61, subd. 2b (2004), which authorizes public employers to provide health insurance coverage for retirees indefinitely. The courts concluded that Norman's reliance on the CBA was reasonable and established CHRA's obligation under promissory estoppel. We affirm, although on different grounds.

Norman was an employee of CHRA from May 23, 1983, to February 24, 1995. The CBA in effect when she retired provided that all employees with at least 10 years of service who retire "shall continue to be covered under * * * the existing hospital medical, surgical, drug and dental programs covering employees of the CHRA * * *." The CBA further provided that CHRA "shall pay all insurance premiums in full, to include single coverage and disability retirement." In September 1995, about 7 months after Norman's retirement, the union was decertified and the CBA expired.

CHRA continued to pay Norman's health insurance premiums under health and dental plans covering CHRA employees until November 2002, more than 7 years after her retirement. At that time, CHRA notified Norman that it would no longer pay her premiums "due to the continuing rising costs of Health Insurance and Budget constraints." Norman sent letters requesting that CHRA recommence paying her health insurance premiums, but CHRA refused.

Norman brought this action against CHRA, and in a motion for summary judg-

ment requested the court to order CHRA "to fulfill its promise to Norman by making back payments to her equal to the cost of insurance she lost from December 1, 2002, until the CHRA again provides her coverage on the same basis it does for current employees of the CHRA." CHRA brought a cross-motion for summary judgment, asserting that CHRA had no obligation to pay Norman's health insurance premiums upon her retirement, that it had "gratuitously" paid the premiums for 7–1/2 years, and that her reliance on CHRA's promise to continue payment was not reasonable in view of Minn.Stat. § 179A.20, subd. 2a, which said that a CBA may not obligate a public employer "to fund" healthcare benefits beyond the duration of the CBA.

The district court granted summary judgment in favor of Norman, concluding that CHRA was obligated to continue the premium payments. The court of appeals affirmed. *Norman,* 681 N.W.2d at 379–80. The court held that limitations in section 179A.20, subdivision 2a, were overridden by more specific and subsequently-enacted provisions relating to insurance continuation for public employees, Minn.Stat. § 471.61, subd. 2b. *Norman,* 681 N.W.2d at 379. The latter provisions require public employers to include retirees in the same insurance group as current employees and authorizes public employers to pay the premiums if a CBA provides that the employer must do so. We granted review of the issue of whether a promise contained in a CBA may bind a public employer to pay retiree health insurance premiums beyond the term of the CBA.

As noted, the parties, district court and court of appeals framed the case in terms of promissory estoppel, undoubtedly in reliance on our decision in *Christensen v. Minneapolis Municipal Employees Retirement Board,* 331 N.W.2d 740 (Minn.

1983). In *Christensen,* we rejected a conventional contract analysis of the public employee's claim for a statutorily based pension because it "tends to deprive the analysis of the relationship between the state and its employees of a needed flexibility," whereas the equitable nature of promissory estoppel allows a court to capture and weigh competing interests of the public and the public employee. *Id.* at 747–49. We also intimated that statutory restrictions on a public employer's authority to bargain and contract to pay pension benefits would preclude a contract analysis, stating, "promissory estoppel precisely applies where, as here, there are no 'contract rights.' " *Id.* at 748.

After *Christensen,* a series of legislative amendments supplied authority to public employers to contract to pay retirees' health insurance premiums. We will consider whether these amendments eliminated the premise underlying our use of promissory estoppel—that the retirees had no contract rights. But we begin our analysis by discussing the history of legislation concerning the authority of public employers to contract to pay retirement benefits. In this discussion, we resolve the conflict between section 179A.20, subdivision 2a, which CHRA argues precludes public employers from contracting to pay retirees' health insurance premiums beyond the term of the CBA, and section 471.61, subdivision 2b, which Norman argues requires public employers to pay retirees' premiums if a CBA so provides.

I.

CHRA relies on section 179A.20, subdivision 2a, enacted in 1988 as part of several changes to the Public Employment Labor Relations Act (PELRA), which provides that:

A contract may not obligate an employer to fund all or part of the cost of

health care benefits for a former employee beyond the duration of the contract, subject to section 179A.20, subdivision 6. A personnel policy may not obligate an employer to fund all or part of health care benefits for a former employee beyond the duration of the policy. A policy may not extend beyond the termination of the contract of longest duration covering other employees of the employer or, if none, the termination of the budgetary cycle during which the policy is adopted.

Act of Apr. 24, 1988, ch. 605, § 7, 1988 Minn. Laws 671, 675. CHRA argues that "to fund" is equivalent to "to pay," and that this section deprives a public employer of authority to contract to pay retiree healthcare benefits beyond the term of the CBA that provides those benefits.

Norman argues that limitations in section 179.20, subdivision 2a, were overridden by the enactment in 1992 of Minn.Stat. § 471.61, subd. 2b, which states in part:

A unit of local government must allow a former employee and the employee's dependents to continue to participate indefinitely in the employer-sponsored hospital, medical, and dental insurance group that the employee participated in immediately before retirement, under the following conditions:

\* \* \* \* \* \*

(e) The former employee must pay the entire premium for continuation coverage, except as otherwise provided in a collective bargaining agreement or personnel policy.

\* \* \* \* \* \*

(k) Notwithstanding section 179A.20, subdivision 2a, insurance continuation under this subdivision may be provided for in a collective bargaining agreement or personnel policy.

To assist in construing these statutes, the court of appeals employed Minn.Stat. § 645.16 (2004): "Every law shall be construed, if possible, to give effect to all its provisions." *Norman,* 681 N.W.2d at 379. The court concluded that the legislature must have intended that the specific authority in section 471.61 for public employers to contract to pay retiree healthcare benefits indefinitely created an exception to general limitations in section 179A.20 on the authority of public employers to contract for pension benefits. *Norman,* 681 N.W.2d at 379.

CHRA and amicus curiae Minnesota School Boards Association (MSBA) counter that the court of appeals' construction of these statutes violates the overriding legislative intent, which they suggest was to produce cost savings for public employers. They argue that allowing a public employer to obligate itself to pay health insurance premiums indefinitely is contrary to that purpose because it "imposes a cost factor, not a savings, to public employers."

We view the matter differently. First, we are persuaded that the purpose for the 1988 amendments was far broader than what CHRA and MSBA suggest. Our reading of the 1988 amendments to PELRA is that their main purpose was to authorize public employers to offer health insurance benefits to encourage highly compensated employees to retire, which would increase health insurance costs but yield greater savings in payroll costs. Our review of the historical context supports this reading.

Before the 1988 amendments to PELRA, a public employer was not authorized to agree in a CBA to pay health insurance premiums for retirees. In fact, a CBA could not provide for any retirement benefits. The obligation of a public employer to meet and negotiate with representatives

of public employees was restricted to "the terms and conditions of employment, * * *." Minn.Stat. § 179A.07, subd. 2 (1986). The phrase "terms and conditions of employment" was defined to exclude "retirement contributions or benefits." Minn.Stat. § 179A.03, subd. 19 (1986). Under this pre–1988 language, we held that a public employer could not be required to bargain over any retirement contributions or benefits. *AFSCME Councils 6, 14, 65 & 96, AFL–CIO v. Sundquist,* 338 N.W.2d 560, 576 (Minn.1983). And the court of appeals followed *Sundquist* to specifically hold that section 179A.03, subdivision 19, "excludes health insurance benefits for retired persons from the scope of collective bargaining for the public sector." *Minnesota Teamsters Public & Law Enforcement Employees Union, Local No. 320 v. Washington County,* 413 N.W.2d 245, 247 (Minn.App.1987), *rev. granted* (Minn. Dec. 18, 1987), *appeal dismissed* (Minn. Apr. 29, 1988).

The 1988 amendments reveal that the legislature chose to authorize a public employer to bargain over retiree health insurance premiums to provide an incentive encouraging early retirement. Because, prior to those amendments public employers could not contract to pay those premiums, it is apparent that the goal was to authorize the employer to pay health insurance premiums so that it could obtain greater payroll savings through early retirements.

The centerpiece of the amendments was a change to the definition of the "terms and conditions of employment" that could be included in a CBA. The 1988 changes to section 179A.03, subdivision 19, provided that the "terms and conditions of employment" could include "employer payment of, or contributions to, premiums for group insurance coverage of retired employees." Act of Apr. 24, 1988, ch. 605, § 4, 1988

Minn. Laws 671, 674–75. In this context, subdivision 2a assumes a meaning contrary to that suggested by CHRA. Rather than being the foundational piece of the 1988 amendments, subdivision 2a was a tool to serve the amendments' central purpose— to encourage early retirement by authorizing public employers to offer retiree health care benefits. Given this overriding intent, it would be unreasonable to conclude that the legislature intended to limit that tool to 1– to 3–year terms typical in a CBA. Minn.Stat. § 179A.20, subd. 3 (1988) (providing that the duration of a CBA "shall not exceed three years"). An employee who would elect to continue employment to obtain health insurance benefits likely would be unwilling to surrender those and other employment benefits solely on the promise of 1– to 3–year insurance premiums.

■ Accordingly, we read subdivision 2a to have a much narrower purpose than what CHRA suggests. Subdivision 2a recognizes that public employers have authority to contract to pay retiree healthcare premiums, and it addresses the narrow question of what impact that authority might have on the employer's budgeting and appropriation processes. We reach this conclusion because subdivision 2a uses the verb "to fund" instead of "to pay." We conclude that subdivision 2a was intended only to relieve public employers from any obligation to appropriate or set aside current resources to "fund" these future liabilities to retirees. The word to "fund" means to "make permanent provision of resources for discharging the interest or principal of" an obligation. *Webster's Third New International Dictionary Unabridged* 921 (1993). Thus, a public employer is authorized under section 179A.03, subdivision 19, to obligate itself in a CBA to pay retiree healthcare premiums indefinitely, and the purpose of subdivision 2a

was to relieve the employer from any obligation to set aside current resources to secure this future liability beyond the duration of the CBA.[1]

Given this reading of the 1988 amendments to PELRA, the addition in 1992 of insurance continuation provisions in Minn. Stat. § 471.61, subd. 2b, does not conflict with PELRA. It clarifies that public employee retirees·must be allowed to continue to participate "indefinitely" in the same "hospital, medical, and dental insurance group" as before retirement. Subdivision 2b(e) states that "[t]he former employee must pay the entire premium for continuation coverage, *except* as otherwise provided in a collective bargaining agreement or personnel policy" (emphasis added). This subdivision authorizes public employers to contract in a CBA to pay insurance premiums on behalf of retirees. And subdivision 2b(k) specifically eliminates any conflict with section 179A.20, subdivision 2a, by providing: "Notwithstanding section 179A.20, subdivision 2a, insurance continuation under this subdivision may be provided for in a collective bargaining agreement or personnel policy."

█ Because section 179A.20, subdivision 2a, does not limit the authority of a public employer to obligate itself to pay retiree health insurance premiums beyond the duration of the CBA that creates that obligation, it does not conflict with section 471.61, subdivision 2b, which likewise recognizes that a public employer is· authorized to obligate itself to pay future retiree health insurance premiums indefinitely where it does so in a CBA.[2]

Our April 1992 decision in *Law Enforcement Labor Services, Inc. v. County of Mower*, 483 N.W.2d 696 (Minn.1992), is relevant to the historical review but does not control our decision. *County of Mower* was decided after the 1988 amendments to PELRA but just days after the 1992 enactment of section 471.61, subd. 2b. *See* Act of Apr. 16, 1992, ch. 488, § 3, 1992 Minn. Laws 379, 380–81. It does confirm that the 1988 amendments to PELRA authorized public employers to bargain for the payment of health insurance premiums for retirees. *County of Mower*, 483 N.W.2d. at 699–701. It did recite that "[i]f the parties reach an agreement, the resulting contract 'may not' obligate the county to fund all or part of the cost of retiree health care beyond the expiration of the contract," but it did not discuss what the words "to fund" meant. *Id.* at 701. And because the parties briefed and argued the case before section 471.61, subdivision 2b, was enacted, we had no need to discuss the section's impact on section 179A.20, subdivision 2a.

Mower County's CBA did not include agreement to pay retiree healthcare premiums. Thus we did not reach the precise issues presented here. But we did hold that the county's promise to pay health insurance premiums, which was not in a CBA but was contained in a notice provided to employees when they retired, was enforceable under promissory estoppel. *County of Mower*, 483 N.W.2d at 701. In fact, we held that the promise was not

---

1. This interpretation is consistent with the authorization in Minn.Stat. § 471.61, subd. 2a (2004), for a governmental unit "which pays all or any part of such premiums * * * to levy and collect a tax * * * in the next annual tax levy for the purpose of providing the necessary funds for the payment of such premiums" and to have such levies excluded, in whole or in part, from "any tax or expenditure limitation."

2. Even if there were a conflict, section 471.61, subdivision 2b, would control because it is the subsequently-enacted and more specific provision. Minn.Stat. § 645.26, subd. 4 (2004).

restricted to the duration of the CBA but "vested for the life of the retiree." *Id.* From that holding, we find some support for our conclusion that section 179A.20, subdivision 2a, does not restrict a public employer's liability for retiree health insurance premiums to the duration of the CBA. If the noncontractual promise in *County of Mower* is not limited to the duration of the CBA, the more solemn contractual promise by CHRA should not be seen as having less longevity.

## II.

Given that CHRA was authorized to include retiree healthcare benefits in the CBA, we next consider what rights accrued to Norman when the CHRA included these benefits in the CBA in effect when she retired. Because the parties framed their arguments under promissory estoppel and the district court and court of appeals addressed the arguments exclusively under that theory, we first turn to promissory estoppel.

As noted earlier, the precedent for viewing public employee claims for retiree benefits under promissory estoppel is our 1983 decision in *Christensen.* This case was decided before PERLA was amended in 1988, at a time when public employers had no authority to include any pension benefits in a CBA. Further, the employee in *Christensen* did not rely on a CBA, but rather on a statutory pension that the legislature attempted to reduce by amendment after the employee retired. *Christensen,* 331 N.W.2d at 742–43. Thus, the case could not proceed under conventional contract law and we faced either perpetuating our prior case law that characterized public employee retirement benefits as a "gratuity" to which the employee had no legal rights, or departing from our case

law to consider the employee's rights under promissory estoppel. We chose the promissory estoppel option as the most "realistic, fair and practical" way to characterize a public employee's interest in a statutory pension. *Id.* at 748.[3]

■ A claim for promissory estoppel has three elements: (1) Was there a clear and definite promise? (2) Did the promisor intend to induce reliance, and did such reliance occur? (3) Must the promise be enforced to prevent injustice? *Olson v. Synergistic Tech. Bus. Sys., Inc.,* 628 N.W.2d 142, 152 (Minn.2001); *see also Christensen,* 331 N.W.2d at 749 (quoting from Restatement (Second) of Contracts § 90 (1981)).

If we apply promissory estoppel to this case, there is no legitimate dispute regarding the first two elements. The CBA contains a clear and definite promise that retirees with at least 10 years of service "shall continue to be covered under * * * the existing hospital medical, surgical, drug and dental programs covering employees of the CHRA" and that CHRA "shall pay all insurance premiums." CHRA should have reasonably expected that this would induce an employee like Norman to believe that her health insurance needs would be paid after retirement. Norman's actual reliance on the promise is shown by her continued employment for the prescribed 10-year period and then her retirement during the term of the CBA. *See, e.g., County of Mower,* 483 N.W.2d at 701.

The dispute in the district court and court of appeals centered on the third prong, whether injustice may be avoided only by enforcing the promise. CHRA argued that the third prong requires Norman to show that her reliance on the

**3.** Similarly, in *County of Mower,* we examined the noncontractual claims of retired public employees under promissory estoppel principles. 483 N.W.2d at 701.

promise was reasonable. CHRA argued that section 179A.02, subdivision 2a, makes it illegal for a public employer to contract to pay pension benefits beyond the term of the CBA, that Norman is presumed to know the law, and that Norman thus could not have reasonably relied on the promise after the CBA expired. But our conclusion that section 179A.20, subdivision 2a, does not make it illegal for a public employer to contract to pay retiree insurance premiums beyond the term of the CBA supports the conclusion that Norman's reliance was reasonable as a matter of law.

If we were to decide this case on promissory estoppel grounds, we would affirm the conclusion of the court of appeals that all elements of promissory estoppel had been shown as a matter of law. But the statutory changes made after *Christensen* require us to re-examine whether promissory estoppel remains appropriate for considering a public employee's interest in a CBA that provides for the employers to pay retiree health insurance premiums.

 We recognized in *Christensen* that promissory estoppel applies only to agreements "implied in law where no contract exists in fact." *Christensen*, 331 N.W.2d at 748 (quoting from *Del Hayes & Sons, Inc. v. Mitchell*, 304 Minn. 275, 283, 230 N.W.2d 588, 593 (1975)). Although promissory estoppel may remain proper for analyzing noncontractual promises of retirement benefits to public employees, the statutory authority granted to a public employer to contract in a CBA to pay retiree health insurance premiums obviates the need to resort to promissory estoppel when a CBA includes this benefit. We

hold that a promise by a public employer, embodied in a CBA, to pay health insurance premiums for an employee who retires during the term of the CBA is enforceable on contract grounds.

 Under a contract analysis, we first look to the language of the contract and examine extrinsic evidence of intent only if the contract is ambiguous on its face. *Blattner v. Forster*, 322 N.W.2d 319, 321 (Minn.1982). A contract is ambiguous if it is susceptible to more than one interpretation based on its language alone. *Metro Office Parks Co. v. Control Data Corp.*, 295 Minn. 348, 351, 205 N.W.2d 121, 123 (1973); *Telex Corp. v. Data Products Corp.*, 271 Minn. 288, 291, 135 N.W.2d 681, 684–85 (1965).

 The CBA in effect when Norman retired provided, in section 5.a, that all qualified retirees who had at least 10 years of service "shall continue to be covered under * * * the existing hospital medical, surgical, drug and dental programs covering employees of the CHRA * * *." Section 5.a further provided that the CHRA "shall pay all insurance premiums in full, to include single coverage and disability retirement." Section 5.a did not limit the promise to pay these premiums to the duration of the CBA. Because Norman retired before the CBA expired, her rights to this benefit vested and necessarily survive the expiration of the CBA. *County of Mower*, 483 N.W.2d at 701 (stating that, upon retirement in reliance on the county's promise of pension benefits, the retiree's "right to such benefits is vested for the life of the retiree and cannot be altered absent the retiree's express consent").[4]

4. *See also Litton Fin. Printing Div. v. Nat'l Labor Relations Bd.*, 501 U.S. 190, 207–08, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991) (holding that when a CBA explicitly provides that certain benefits continue after the agreement expires, such benefits "arise under" the CBA and therefore disputes regarding them are subject to postexpiration arbitration procedures unless negated expressly or by clear implication); *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 258 (Alaska 1996) (holding that police officers' and firefighters'

This conclusion is reinforced by the parties' practical construction of the CBA. CHRA did not terminate Norman's insurance on the expiration of the CBA, but instead paid Norman's insurance premiums for more than 7 years thereafter. We hold that Norman's right to the payment of health insurance premiums vested at the time she retired and CHRA cannot now unilaterally terminate those benefits.

Affirmed.

Concurring, ANDERSON, G. BARRY, J. and BLATZ, C.J.

ANDERSON, G. BARRY, J. (concurring).

Respondent Norman has satisfied all elements necessary to enforce a promise under promissory estoppel, and CHRA has not shown any need to break its promise to her. Norman is therefore entitled to relief and I concur with the result reached by the majority.

But I conclude that this record does not support the contractual analysis used by the majority and would decide this dispute on the promissory estoppel principles we adopted in *Christensen v. Minneapolis Municipal Employees Retirement Board,* 331 N.W.2d 740 (Minn.1983).

The majority opinion holds, "the statutory authority granted to a public employer to contract in a CBA to pay retiree health insurance premiums obviates the need to resort to promissory estoppel when a CBA includes this benefit." But this grant of authority, found in the 1988 amendments to the Public Employment Labor Relations Act, *see* Act of Apr. 24, 1988, ch. 605, § 4,

1988 Minn. Laws 671, 674–75 (codified at Minn.Stat. § 179A.03, subd. 19 (1988)), does no such thing because, although Minnesota law is hardly clear on this point, contractual obligations generally do not survive the expiration of a collective bargaining agreement. *See, e.g., Litton Fin. Printing Div. v. Nat'l Labor Relations Bd.,* 501 U.S. 190, 207–08, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991).

The policies necessitating examination under promissory estoppel have not changed. Prior to our decision in *Christensen,* a public retirement benefit was considered a mere gratuity, a "bounty springing from the graciousness and appreciation of sovereignty." *Gibbs v. Minneapolis Fire Dep't Relief Ass'n,* 125 Minn. 174, 177, 145 N.W. 1075, 1077 (1914). We noted in *Christensen* that this view was justified in the early 20th century, when retirement benefits generally were insignificant in amount and not considered compensation for work rendered. *Christensen,* 331 N.W.2d at 746. In *Gibbs,* the interest of the sovereign was paramount as against the interest of the public employee. But as employees relied more on promised pension benefits, the balance between the interest of the sovereign and the employee changed. In *Gorczyca v. City of Minneapolis,* 174 Minn. 594, 598, 219 N.W. 924, 925 (1928), we stated that a retirement allowance "is not a gratuity when the services are rendered while the pension or retirement relief statute is in force, so that the statute becomes a part of the contract of employment and contemplates such pension or allowance as part of compensation for the services rendered." In *Christensen,* we weighed these competing interests

CBA intended for pension rights to vest upon retirement); *Poole v. City of Waterbury,* 266 Conn. 68, 831 A.2d 211, 223–24 (2003) (holding that "[f]rom the employee's perspective, the promise of health insurance benefits at retirement may be a significant inducement in

determining employment. * * * Employees reasonably relying on * * * a promise may be put in an untenable position when their employer unilaterally withdraws or substantially diminishes benefit insurance.").

and expressly rejected a contractual analysis. In so doing, we stated, "[a] conventional contract approach, with its strict rules of offer and acceptance, tends to deprive the analysis of the relationship between the state and its employees of a needed flexibility." 331 N.W.2d at 747.

The majority opinion concludes that the legislature intended a radical change in its approach to retirement health insurance benefits. In 1988, the legislature added "employer payment of, or contributions to, premiums for group insurance coverage of retired employees" to the terms and conditions of employment that may be negotiated in a collective bargaining agreement. Act of Apr. 24, 1988, ch. 605, § 4, 1988 Minn. Laws 671, 674–75 (codified at Minn. Stat. § 179A.03, subd. 19 (1988)). The majority argues that the legislature intended to create a contractual right of indefinite duration between government and its soon-to-be former employees to produce cost savings by encouraging early retirement. To this end, the majority relies on dates of statutory adoption and the logical, even if unsupported, conclusion that employees would not retire with an incentive of only a three-year health insurance benefit.

It is indeed possible that the legislature intended to do just that; regrettably, the legislature did not expressly state this intention, but only added to the terms that may be included in a collective bargaining agreement of limited duration. The legislature, which is knowledgeable about and heavily involved in regulating negotiation of collective bargaining agreements, could have easily inserted specific authorizing language extending the term of retiree health insurance provisions beyond the length of a collective bargaining agreement either indefinitely or for some other term. The legislature, which was well aware of our decision five years earlier in *Christen-*

*sen* establishing our promissory estoppel analysis for benefits extending beyond the term of a collective bargaining agreement, could have added language explicitly creating a contractual right. But it did not do so. Where the legislature did face the question, language of limitation was employed rather than language of expansion: "A contract may not obligate an employer to fund all or part of the cost of health care benefits for a former employee beyond the duration of the contract, subject to 179A.20, subdivision 6." Minn.Stat. § 179A.20, subd. 2a (2004).

In response to this language, the majority engages in a definitional analysis and concludes that "fund" is not the same as "pay." But authority for this proposition is limited to a common dictionary definition. The majority then uses the distinction between "fund" and "pay" as a way around what would otherwise be a barrier to a contractual analysis. But in fact, fund and pay are often interchangeable. *See, e.g., Black's Law Dictionary* 697 (8th ed.2004) (defining "fund" as "to furnish money to (an individual, entity, or venture)"). Whatever nuanced distinctions may exist between "fund" and "pay," in practice those distinctions are not sufficiently convincing to support the majority's divination of legislative intent. If the legislature intended to create a contractual right, the legislature could have done so. It did not, and based on separation of powers principles, we should act with restraint.

Further, it is unnecessary to reach this question in the first instance because the respondent has made a powerful and persuasive argument that promissory estoppel mandates the result reached by the district court and the court of appeals. I would affirm the court of appeals on the basis of promissory estoppel and would not use the

contractual analysis framework adopted by the majority opinion.

BLATZ, C.J. (concurring).

I join in the concurrence of Justice G. Barry Anderson.