MINNESOTA TEAMSTERS PUBLIC &
LAW ENFORCEMENT EMPLOY-
EES UNION, LOCAL 320, petitioner,
Appellant,

v.

The COUNTY OF ST. LOUIS,
Respondent.

No. A06–841.

Court of Appeals of Minnesota.

Feb. 6, 2007.

Patrick J. Kelly, Trevor S. Oliver, Kelly & Fawcett, P.A., St. Paul, MN, for appellant.

Melanie S. Ford, St. Louis County Attorney, Amy H. Kuronen, Assistant County Attorney, Duluth, MN, for respondent.

Considered and decided by MINGE, Presiding Judge; SHUMAKER, Judge; and HUDSON, Judge.

## OPINION

MINGE, Judge.

Appellant union challenges summary judgment in favor of respondent public employer claiming that the employer failed to provide health insurance consistent with negotiations, that the employer refused to cooperate in submitting this dispute to the grievance procedure, and that the employer committed an unfair labor practice by failing to engage in the grievance process or negotiations over the dispute. Because the parties executed a collective bargaining agreement that clearly does not include the health insurance benefits appellant claims the parties negotiated, we affirm.

## FACTS

Appellant, Minnesota Teamsters Public & Law Enforcement Employees Union, Local No. 320 (the union), is the exclusive representative of St. Louis County Highway Department Maintenance employees. Respondent St. Louis County (the county) is a public employer pursuant to the Public Employment Labor Relations Act (PELRA), Minn.Stat. ch. 179A (2006). This controversy is over healthcare benefits that were the subject of negotiations leading to the May 11, 2005 collective bargaining agreement (CBA) between the parties.

The parties engaged in extended negotiations for a new CBA to replace one that expired on December 31, 2003. Employees worked without a new agreement for several weeks. The details of health insurance coverage constituted a major topic of negotiation. The parties reached a tentative agreement on April 1, 2004, the last day before union members could call a strike. The county's representatives prepared a document entitled "Tentative Agreement" the next day. This document, along with an attached "Group Health Insurance Proposal," included an outline of health insurance benefits for a new plan that was to take effect starting January 1, 2005, the second year of the contract. According to the proposal, group health insurance benefits included: $0 co-payments for office visits; 100% coverage of preventative medical services; bundling of diabetic supplies; no changes to the drug maintenance list; $500 family deductible; and $10/$20/$40 scale of co-payments for prescription drugs. The tentative agreement also indicated: "The actual descriptions of the group hospitalization plan benefits are contained in the plan documents, not in the labor contract." And the attached health insurance proposal read:

> This proposal is not a contract and should serve only as an outline. All benefits are detailed in the final approved contract or certificate. Rates and premiums are estimates based on the employee data submitted, subject to home office underwriting, and do not imply a guarantee of coverage or quoted rates.

The terms of the tentative agreement were submitted to the members of the bargaining unit, voted on, and approved.

After the vote, the county sent a summary of the tentative agreement to the union. The union objected, contending that the summary was at odds with the parties' agreement. On May 5, 2004, both the county and the union's representatives signed a "letter of agreement," stating: "The signature copies of the CBA are contingent on the basis there will be no office co-pays for chiropractors or otherwise, for any office visits."

The county's representative prepared the final draft of the CBA. The county

board approved the CBA on May 11, 2004, and both parties signed on that date. The CBA covered the period of January 1, 2004 through December 31, 2005. With respect to health insurance, the CBA provided that effective January 1, 2005, a new plan would replace the existing health plan and require the county, as the employer, to pay a stated percentage of premiums. The CBA also specified certain co-pays for prescriptions. With respect to insurance claims against the county, the CBA provides:

> Any description of insurance benefits contained in this Article is intended to be informational only and the eligibility for benefits shall be governed by the terms of the insurance policy and not by this Agreement. The EMPLOYER'S only obligation is to pay such amounts as agreed to herein and no claim shall be made against the EMPLOYER as a result of a denial of insurance benefits by an insurance carrier, except in case of error by the EMPLOYER in reporting information to the insurer.

The CBA did not address other terms that were the subject of negotiations, including co-pays for office visits. The record does not indicate why these terms were not included in the CBA.

The new health insurance plan became effective on January 1, 2005. Shortly thereafter, the union alleged that the county unilaterally changed the contract terms for health insurance coverage and violated the contract by not honoring the specific level of health insurance benefits identified in

the tentative agreement and the May 5 letter. Among other objectionable changes, the union identified the requirement of co-pays for office visits and the lack of coverage for various prescriptions that had previously been included in the category of maintenance drugs. The county denied any violation, asserting that there was no required co-pay for office visits, but that the annual deductible included the cost of office visits until the deductible amount had been reached,[1] that the identification of what drugs were classified as maintenance drugs was an insurance policy detail, and that both the tentative agreement and the CBA made clear that the insurance policy, not the CBA, controlled the description of benefits. The union filed a grievance application, which the county denied, stating among other reasons, that the issue was not appropriate for the grievance process. Next, the union requested a hearing before the St. Louis County Grievance Board. The county also denied this request, reasoning that the union was attempting to reform the CBA rather than clarify it.

The union filed suit, claiming that the county violated the CBA by failing to pay the correct premiums and committed unfair labor practices and violated the terms of the CBA by its refusal to participate in the grievance procedure. The union requested a court order compelling respondent to participate in the grievance procedure. The union also sought reimbursement for any medical costs incurred by members because of the county's alleged violation of the CBA. Both parties

---

**1.** The collective bargaining agreement does not define the terms "co-pay" and "deductible." However, we note that a deductible "exempts the insurer from paying a specified amount in the event of a claim." *The American Heritage College Dictionary* 369 (4th ed. 2002). A copayment is "[a] fixed fee that subscribers to a medical plan must pay for their use of specific medical services covered by the plan." *Id.* at 315. These definitions are consistent with the parties' use of these terms in this appeal.

moved for summary judgment on the terms of health insurance, the applicability of the grievance/arbitration procedure, and the claim of an unfair labor practice. The district court denied the union's motion for summary judgment, but granted the county's motion and entered judgment accordingly. This appeal follows.

## ISSUES

I. Did the district court err in ruling that the county did not violate the CBA?

II. Did the district court err in ruling that the underlying dispute does not fall within the definition of "grievance," requiring arbitration under the parties' grievance procedure?

III. Did the district court err in ruling that the county did not commit an unfair labor practice?

## ANALYSIS

■■■ On appeal from summary judgment, this court considers whether there are any genuine issues of material fact and whether the district court erroneously applied the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). No genuine issue for trial exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *DLH, Inc. v. Russ,* 566 N.W.2d 60, 69 (Minn.1997) (quotation omitted). "[T]he party resisting summary judgment must do more than rest on mere averments." *Id.* at 71. A genuine issue for trial must be established by "*sufficient evidence* to permit reasonable persons to draw different conclusions." *Schroeder v. St. Louis County,* 708 N.W.2d 497, 507 (Minn.2006). On appeal, we "view the evidence in the light most favorable to the party against whom judgment was grant-

ed." *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993). Summary judgment is inappropriate if the contract is ambiguous or uncertain. *Donnay v. Boulware,* 275 Minn. 37, 45, 144 N.W.2d 711, 716 (1966). In such cases, the district court should give the parties a full opportunity to present evidence of the facts, circumstances, and conditions surrounding the contract's execution and the parties' conduct. *Id.*

### I.

■■■ The first issue is whether the district court erred by granting summary judgment to the county and denying the union's motion based on its holding that the county did not violate the CBA. We interpret and enforce a CBA as we do other contracts. *Hous. & Redevelopment Auth. of Chisholm v. Norman,* 696 N.W.2d 329, 337 (Minn.2005); *Mueller v. Chicago & Nw. Ry. Co.,* 194 Minn. 83, 85, 259 N.W. 798, 799 (1935). The union agrees that traditional contract law principles apply. A written contract supersedes all contract negotiations. *Hoyt v. Brokaw,* 359 N.W.2d 310, 311 (Minn.App.1984).

■■■ The union contends that the district court erred by finding that the CBA is unambiguous and urges us to examine the parties' tentative agreement. Whether a contract is ambiguous is a question of law. *Id.* "[W]e first look to the language of the contract and examine extrinsic evidence of intent only if the contract is ambiguous on its face." *Norman,* 696 N.W.2d at 337; *see also Local 377, Chauffeurs, Teamsters, Warehousemen, & Helpers of Am. v. Humility of Mary Health Partners,* 296 F.Supp.2d 851, 860 (N.D.Ohio 2003). Ambiguity exists if contract language is "reasonably susceptible of more than one meaning...." *Hoyt,* 359 N.W.2d at 311. "[W]ritings other than the

contract [can] not be used to create an ambiguity which [does] not exist in the contract itself." *Kenko, Inc. v. Lowry Hill Constr. Co.*, 392 N.W.2d 18, 20 (Minn.App. 1986), *review denied* (Minn. Oct. 22, 1986).

The CBA, on its face, is not ambiguous. With respect to employee health insurance plans effective January 1, 2005, the CBA provides:

*Section 1.* The EMPLOYER agrees to permit all employees to be covered by the group hospitalization insurance programs under the St. Louis County Employee Plan, and to contribute to the premium as follows:

| | Option A | Option B |
|---|---|---|
| Single Coverage | 100% | 100% |
| Dependent Coverage | 80/20 | 85/15 |

Prescription co-pays shall be as follows: $10.00 generic; $20.00 formulary brand-name; $40.00 non-formulary brand name.

. . . .

[Sections 2 & 3 Life and Dental Insurance]

*Section 4. Claim Against EMPLOYER.* Any description of insurance benefits contained in this Article is intended to be informational only and the eligibility for benefits shall be governed by the terms of the insurance policy and not by this Agreement. The EMPLOYER'S only obligation is to pay such amounts as agreed to herein and no claim shall be made against the EMPLOYER as a result of a denial of insurance benefits by an insurance carrier, except in case of error by the EMPLOYER in reporting information to the insurer.

The district court found that the written CBA superseded the parties' "[p]rior summaries, settlements or 'tentative agreements'. . . ." But the union contends that the April 2, 2004 tentative agreement and the May 5 letter agreement statements that there would be no co-pays, reflect the parties' final position and that any changes to the health insurance provisions after that date constitute a breach of contract. Although the CBA did not contain a merger clause, that does not mean prior negotiations become part of the contract. "[T]he absence of a merger clause in a writing does not necessarily open the door to parol evidence." 29A Am.Jur.2d *Evidence* § 1095 (1994). The union's argument is based on the tentative and letter agreements, which predate the CBA. We note that neither of these preliminary agreements state that the deductible does not apply to office visits.

The union further argues that by their vote, the employees, as members of the bargaining unit, accepted the terms of the tentative agreement and that this members' vote is significant in interpreting the contract. We acknowledge that this membership vote distinguishes collective bargaining agreements from standard contracts. Yet, we note that in this case the union agrees that the standard principles of contract law apply. The record indicates that the CBA was presented to the union representatives for approval and signature. Both union and county officials signed the CBA. There is no claim the union representatives lacked authority. The fundamental issue is whether CBA displaces the earlier negotiations.

■ This case is the inverse of the situation in *Norman*. There, the public employer argued that the promised retiree health insurance benefits as specified in the collective bargaining agreement were not enforceable and that public employers were not bound by traditional contract analysis. 696 N.W.2d at 332. The district

court held that the employer's promise, as contained in the CBA, was enforceable on contract grounds. *Id.* at 337. Here, the claimed commitments were not embodied in the CBA. The dispute is largely over whether the deductible amount applies to physician and chiropractic office visits. The CBA does not attempt to cover this, except to say that the actual insurance policy controls. Prior negotiations, especially if they are unclear, are not an implied part of the CBA. *See Hoyt,* 359 N.W.2d at 311. Here, the prior negotiations do not address the interplay between the concept of a deductible and a co-pay.

Because the CBA represents the final agreement between the parties and because there is no claim of fraud, duress, bad faith, mutual mistake, lack of authority, or special circumstances that affect the application of traditional contract law to this area of public employer labor agreements, we conclude that the county did not violate the parties' agreement, and we· uphold the district court's grant of summary judgment based on its ruling that the county did not breach the CBA. We note that this is not a situation in which benefits contained in the CBA have been arbitrarily eliminated by an abusive interpretation of the contract.

## II.

■ The second issue is whether the district court erred in granting summary judgment based on its determination that disputes over the co-pays and deductible in the new medical insurance plan were not subject to the grievance and arbitration procedure. This court reviews de novo a district court's decision regarding the arbitrability of disputes. *Minn. Teamsters Pub. & Law Enforcement Employees' Union Local No. 320 v. County of St. Louis,*

611 N.W.2d 355, 358 (Minn.App.2000). When considering whether to compel arbitration, this court considers "whether the dispute falls within the scope of the arbitration agreement." *Id.* (quotation omitted).

■ Minnesota law requires that all collective bargaining agreements include a grievance procedure. Minn.Stat. § 179A.20, subd. 4(a) (2006). The statute defines "grievance" as "a dispute or disagreement as to the interpretation or application of any term or terms of any contract required by section 179A.20." Minn.Stat. § 179A.21, subd. 1 (2006). "A liberal and broad construction of the term 'grievance' as used in collective bargaining agreements should be given in the interest of encouraging the use of machinery which has been set up for peaceful settlement of disputes." *Ekstedt v. Village of New Hope,* 292 Minn. 152, 161, 193 N.W.2d 821, 827 (1972). The *Ekstedt* court concluded that it is "reasonable to conclude that the Minnesota statutory reference relates to some complaint related to terms or conditions of employment." *Id.*

Here, Article 9 of the parties' CBA describes the grievance procedures. The CBA defines "grievance" as "a dispute or disagreement raised by an employee against the County involving the interpretation or application of the specific provisions of this AGREEMENT, including disciplinary actions; provided, however, that a grievance shall not include any matter which is not within the authority of the County to act." The CBA then establishes a four-step grievance process, with the final step providing for arbitration of disputes. The CBA also provides: "The decision shall be based solely upon the arbitrator's interpretation of the meaning or application of the express terms of this

AGREEMENT to the facts of the grievance presented." The CBA limits the scope of the arbitrator's decision-making authority: "The arbitrator shall have no right to amend, modify, nullify, ignore, add to, or subtract from the provisions of this AGREEMENT." Finally, "[i]f the arbitrator finds that the grievance concerns matters not covered by this AGREEMENT or the procedures contained herein have not been adhered to, the arbitrator shall return the matter to the parties without decision."

In this case, the district court found both that the union did not file a proper grievance request and that the dispute is not subject to the grievance procedure. We conclude that the dispute did not arise out of the contract, but rather out of the tentative agreement and letter agreements that preceded the CBA. Both the law and the CBA limit grievances to terms within the contract. Because the tentative and letter agreements are outside of the CBA and because we have found that the county did not violate the CBA, we conclude that the district court did not err in granting the county's motion for summary judgment while denying the union's motion.

### III.

■■■■ The final issue is whether the district court erred by dismissing on summary judgment the claim that the county committed an unfair labor practice. The union contends that the county's refusal to bargain or refer the situation to a grievance hearing constituted an unfair labor practice. When a district court grants summary judgment based on the application of a statute to undisputed facts, this court applies de novo review. *Educ. Minn.—Greenway, Local 1330 v. Indep. Sch. Dist. No. 316*, 673 N.W.2d 843, 849

(Minn.App.2004), *review denied* (Minn. Apr. 20, 2004).

■■■■ A public employer commits an unfair labor practice when the employer refuses "to meet and negotiate in good faith" over the terms and conditions of employment. Minn.Stat. § 179A.13, subd. 2(5) (2006). PELRA defines "[t]erms and conditions of employment" as: "[T]he hours of employment, the compensation therefor including fringe benefits except retirement contributions or benefits other than employer payment of, or contributions to, premiums for group insurance coverage of retired employees or severance pay, and the employer's personnel policies affecting the working conditions of the employees." Minn.Stat. § 179A.03, subd. 19 (2006). "The crucial inquiry ... is whether the employer's ... action deprived the union of its right to negotiate a subject of mandatory bargaining." *Foley Educ. Ass'n v. Indep. Sch. Dist. No. 51*, 353 N.W.2d 917, 921 (Minn.1984).

Appellant relies on *Educ. Minn.—Greenway Local 1330* to support its position that the county committed an unfair labor practice by refusing to bargain on a mandatory bargaining subject. In that case, the parties did not dispute that the employer had unilaterally changed employment terms and conditions when it froze wages and benefits. *Educ. Minn.—Greenway Local 1330*, 673 N.W.2d at 849. Nevertheless, the employer argued that it did not commit an unfair labor practice because it "continued to negotiate about the new contract...." *Id.* The court ultimately concluded that the unilateral freeze violated the employer's duty to meet and negotiate, which constitutes an unfair labor practice. *Id.* at 852.

But here, unlike the situation in *Educ. Minn.—Greenway Local 1330*, there are

no material facts tending to show that the county unilaterally changed the CBA. There are also no material facts showing that the matter is subject to grievance or an arbitration hearing. The union argues that the county violated a "tentative agreement" which predates the CBA. A grievance over a "tentative agreement" is not within the CBA. In this case, the union is attempting to use grievance arbitration to change an unambiguous term in the CBA and to add to the agreement language that the parties omitted. The CBA clearly states that health benefits are determined by the insurance policy. Even the health insurance proposal attached to the tentative agreement states that "[a]ll benefits are detailed in the final approved contract or certificate." The dispute in this case is not appropriate for arbitration. Therefore, we hold that the district court did not err in granting summary judgment in the county's favor on the claimed unfair labor practice.

## DECISION

The district court did not err in granting summary judgment to the county and in determining that the county did not violate the CBA, that the underlying dispute does not fall within the definition of grievance, and that the county did not commit an unfair labor practice.

**Affirmed.**